The questions made by the bill and answer relate to the existence of a deed for a tract of land in Orange County, which it is alleged was made by Robbs to Benjamin Cantrell, his son-in-law, and which the widow of the latter (since intermarried with the defendant Browning) has since his death destroyed or now conceals. The complainants are the children of Benjamin Cantrell and the defendant Sophia, and of course entitled to the inheritance if the fee ever vested in their father; otherwise it descended to Sophia, the defendant, from her father Robbs, and she is still seized.
The witness mainly relied on to prove that such a deed once existed is James Yancey, the substance of whose testimony is that on 6 February, 1816, he, together with John Henslee, met at the house of Benjamin Cantrell, deceased, for the purpose of taking an inventory of his estate; and in looking over the papers he saw a deed of gift from Robbs to Cantrell for eight or nine hundred acres of land in Orange County, of which part was reserved to Robb's widow during her life; and the boundaries of this part, as described in the deed, the witness states. In various conversations he had with the defendant Sophia after that time she always said she would divide the Orange land equally among the children, in which she persisted until after her marriage with the other defendant. This witness administered on Cantrell's effects, and went to the house after the defendant's marriage to possess himself of the papers; when for some time the defendant Sophia refused to let him have them, but at length allowed him to look over part of them. There was a small bag full of papers, which she took up, saying it was her father's old papers, which she would *Page 351 
suffer no one to have. When the sale took place she said she still had these papers in a trunk, which was sold after they were taken out. The witness does not recollect the date of the deed, but his impression is that it bore date in 1807 or 1809; he thinks there were two subscribing witnesses to it, but cannot remember who they were; (646) he did not sufficiently notice the handwriting of the body of the deed to recognize it, but the execution was in the handwriting of Robbs, of which he has no other knowledge than from seeing papers signed by him (as the defendant Sophia told him) among the papers of Cantrell, and the signature was in an indifferent, clumsy, old-fashioned hand. He read this deed over in the presence of John Henslee, now deceased, William Cantrell, and the defendant Sophia, audibly, to enable the first-named person to take down the number of acres, to the end of ascertaining each child's share, which was computed at 200 acres. After examining the deeds they were returned to the defendant Sophia, who put them in a small bag, which was deposited in a trunk, which bag he thinks was the same which Sophia withheld when he went to get the papers of the estate, saying they were the papers of her father, which no one should have. He had a conversation with Sophia the day after the inventory was taken concerning her dower, when she expressed a preference for the lands in Orange and a residence there; but upon the witness recommending to her rather to be endowed of the lands in Caswell she replied she would think of it. Afterwards, when her daughter was married, Sophia told him she would follow his advice as to her dower, and that the land in Orange, and the rest in Caswell, should be divided amongst her children. She did not, either when the deed was read or at any time till her marriage, set up a claim to the land in Orange. On further reflection the witness thinks the deed was executed with the name of Alexander Robbs and a mark made, he thinks an "R."
 William Cantrell was present at the time, and heard Yancey
read a deed, who, upon the witness asking him what he was reading, said it was a deed from Alexander Robbs to Benjamin Cantrell; but the witness does not know from what he heard of the reading (647) where the land lay, whether Yancey read the deed through or not, nor does he recollect anything that was read. This was the first knowledge he had of the existence of such an instrument of writing.
This evidence is opposed by the defendants: first, by Solomon Parks, who says that a short time before Cantrell's death he came to his house to borrow money, and remarked that he would have sold some land that lay in Orange County to Fonville, but that his wife was not *Page 352 
willing. The witness replied, Why is that an obstacle? for if it belongs to your wife it is your property. Cantrell said, that is not the case; it is her's conveying to the mind of the witness that it had descended from her father, Robbs. During the widowhood of Sophia she came to the witness's house, who, being under the impression thus made, advised her to take her dower in Caswell, and to consult with a lawyer.
Some time afterwards the deponent requested the witness Yancey to come to his house upon business, and in the course of conversation concerning the estate of Cantrell asked him if he had inventoried the lands in Orange as part of the estate, and upon his saying yes, the witness asked how that could be, as he understood the land belonged to the widow. Yancey replied that he had seen among Cantrell's papers a deed for those lands from Robbs to Cantrell; and upon being further asked who was the subscribing witness, answered there was none to the deed. This conversation took place in the spring of 1817, and Yancey's deposition was taken in September following. Alexander Vincent says he was present when Yancey was looking over Cantrell's papers, and sat within five feet of him, and thinks he heard some papers read by him audibly, but none conveying title from Robbs to Cantrell.
Richard Jones had access to all Cantrell's papers during his lifetime, and not long before his death; that he brought a trunk to (648) witness's house containing papers, who read them for him; they were deeds from different persons to A. Robbs, but not one from Robbs to Cantrell. Cantrell confided much in this witness, often spoke to him about his affairs, constantly spoke of the Orange lands as his wife's, which he said he would sell and move away if she consented. Even when the widow of Robbs was petitioning for dower out of them, he mentioned them by no other description than as his wife's.
William Dickey and James Fawcett were called upon to take an inventory of Robbs' property, after his death, they examined a trunk containing his papers, chiefly deeds to him, but saw no conveyance from Robbs to Cantrell, whom they never heard claim the Orange land otherwise than in right of his wife.
Hardy Hurdle was much in the confidence of Robbs, who was an illiterate man, and got the witness to arrange his papers, and sometimes to write for him. Robbs said he could not make a will to please his wife unless he left his property at her disposal; that the law would make a will for him, and he desired Cantrell to be his heir, at the same time taking a trunk and key and delivering it to him as his property; *Page 353 
this trunk contained valuable papers, and the witness thought Robbs meant by this act to give all the right he could to Cantrell.
William Bronnich was intimately acquainted and connected with Cantrell and Robbs, whom he has often heard conversing about the land in Orange, but never understood from them that Cantrell had any other claim than in right of his wife, whom Robbs said it would devolve upon as his heir at law. After the death of Robbs, when the widow petitioned for dower in the Orange land, Cantrell opposed no claim against her.
Thomas Shanks heard Cantrell trying to persuade his wife to sell part of the land to Fonville, who would not agree to it unless Fonville would take the whole, notwithstanding Cantrell's urging (649) his want of money.
Frederick Fonville offered to buy the land from Cantrell and his wife, telling Cantrell he had only a life estate, to which he answered he knew it was his wife's. Cantrell was pressed for money, and would have sold the land could he have got his wife to join in the conveyance.
E. Jones heard the defendant Browning say something about his wife's snatching some papers from Mr. Yancey some night when they were looking over papers, and said there had been such papers seen, but they would never be seen again he reckoned; and,
John West says that Browning was at his house one Sunday, and said the opposite party had been saying something about papers being snatched, but as for his part he knew nothing of it.
This is the substance of the evidence on which the Court has to decide whether a deed was made to Benjamin Cantrell by his father-in-law, Alexander Robbs, and whether it has been suppressed or concealed by the defendants. The first observation that occurs is that as the defendants distinctly and positively deny that such a deed ever existed, or that they have destroyed or concealed it, the Court must place as much confidence on the consciences of the defendants as on the testimony of a single witness; unless there be some circumstances in the case to invest the latter with a superior degree of credit. If there be any one circumstance to overbalance the credit of the denial, it is admitted that a court of equity will decree upon the testimony of one witness. A patient examination of the evidence will, I think, show that all the circumstances throw additional weight into the scale of the answer, and that none of them tend to confirm and strengthen the testimoney [testimony] of Mr. Yancey.
His recollection of the manner in which the deed was executed (650) is vague and unsatisfactory; he at first thought it was in a *Page 354 
clumsy, old-fashioned hand, and that he believed it to be Robbs' from its resemblance to other signatures which his daughter told him were his. Upon further reflection he thought it was signed only with the letter "R." A particular description of the character of a handwriting seems to be consistent only with a distinct remembrance of it; and an impression that it was clumsy and old-fashioned does not seem likely to have been made on the mind by the inspection of a single letter made by a man who could, perhaps, make no other. The deposition was made in September, 1817; the reading of the deed occurred in February, 1816, an interval of time in which the remembrance of so important a circumstances as the execution of a deed on which depended the title of sixteen hundred acres of land would not in ordinary cases be effaced. But the boundaries of the part reserved to Robbs' wife were accurately remembered. The date was not remembered, but the witness thought it bore date in 1807 or 1809, which is impossible if it were a genuine deed, for several witnesses have deposed that Robbs died in 1805. When the deposition was taken the witness thought there were two subscribing witnesses to the deed; but in the spring of the same year, in a conversation with Parks, he said there were none. From this witness' deposition the only inference I make is that the circumstance is too indistinctly remembered by him, and too inconclusively proved, to authorize any court, even if there were no answer on oath to take away the defendant's inheritance.
Nor does this evidence derive any support from Cantrell, the only other witness now alive who was present on the occasion. He did hear Yancey read a deed, but from the reading he knew not what deed it was, or what land it was made for; Yancey told him, upon being asked, the nature of the deed; and that must still depend upon Yancey's testimony.
(651) If such a deed had existed, it is scarcely credible that neither Robbs nor Cantrell should have mentioned it to some of those persons upon whom, both being illiterate men, they had such frequent occasion to rely for the transaction of the most common business; that it should not have been seen by any in the lifetime of Robbs, nor after his death when all his papers were given over to Cantrell, who exposed them to Richard Jones a short time before his death. And what motive could exist for making such a conveyance? The defendant Sophia was the only child of Robbs, who made no secret of his resolution to die intestate, on account of the difficulty of making such a will as would be satisfactory to his wife, uniformly declaring that Cantrell should be his heir, and on one occasion delivering to him all his valuable papers. *Page 355 
The conduct of Cantrell in the latter years of his life is utterly irreconcilable with the belief that such a conveyance was made. Repeatedly suffering under pecuniary pressure, which he had an opportunity of removing by the sale of the Orange land he constantly asserted, and acted upon the belief that it belonged to his wife, whom he urged, but in vain, to join in the sale of part.
The widow of Robbs claimed dower in the very land, and filed a petition for it, yet instead of asserting his title from her husband, or in any way obstructing her claim, though fully apprised of it, he passively acquiesced, and suffered the dower to be assigned.
I do not think that any rational inference can be drawn from the claim or belief of the defendant Sophia one way or the other. All the parties seem to be sufficiently uniformed, and she, perhaps, was not the wisest among them. She might think, from her father's declarations, that her husband inherited the land from him, and at the same time believe that he could not sell it without her joining in the sale, while she might also think, as she seems to have done until her second marriage, that she was entitled only to dower upon the (652) death of Cantrell. The speculations or delusions of a woman ignorant of her rights can afford no safe ground for the judgment of a court.
I have laid no stress upon the testimony of Vincent, because I do not ascertain upon looking into the deposition that he was present on the occasion spoken of by Yancey, who says it was about the 6th, whereas Vincent speaks of a reading on the 9th. It is possible that they speak to different meetings, and therefore safer to omit it altogether. Nor have I noticed the testimony of E. Jones and J. West, as I cannot connect it with any other part of the evidence except the taking up of the bag spoken of by Yancey. If they were Robbs' papers Sophia had a right to them, and any inference that the deed was in it must depend upon the foundation that its existence was sufficiently proved.
Upon the whole, my opinion is that the bill be
PER CURIAM. Dismissed with costs.
 *Page 1